UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHABBU SAHMAL OWENS,

               Plaintiff,                Case No. 15-10920
                                         District Judge Laurie J. Michelson
v.                                 Magistrate Judge R. Steven Whalen

COMMISSIONER OF SOCIAL
SECURITY,

               Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Chabbu Sahmal Owens ("Plaintiff") brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying his application for Disability Insurance Benefits ("DIB") and Childhood Insurance Benefits under the Social Security Act. Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment [Docket #16] be GRANTED, and that Plaintiff's Motion for Summary Judgment [Docket #15] be DENIED.

-1-

## I.  PROCEDURAL HISTORY

Plaintiff applied for DIB on May 10, 2012, alleging disability as of May 22, 1991[1](Tr. 143).  After the initial denial of benefits, Plaintiff requested an administrative hearing, held on July 24, 2013 in Lansing, Michigan (Tr. 32).  Administrative Law Judge ("ALJ") Richard P. Gartner presided.  Plaintiff, represented by Ina O'Briant, testified (Tr. 37-77), as did Vocational Expert ("VE") Toni McFarlane (Tr. 78-84).  On October 2, 2013, ALJ Gartner found Plaintiff not disabled (Tr. 27-28).  On January 7, 2015, the Appeals Council denied review (Tr. 1-3).  Plaintiff filed for judicial review of the final decision on March 12, 2015.  The undersigned heard oral argument on July 12, 2016.

## II.  BACKGROUND FACTS

Plaintiff, born October 10, 1971, was just short of his 42nd birthday at the time of the ALJ's decision (Tr. 28, 143).  He completed one year of college and worked previously as a customer service provider, laborer, shuttle driver, and telemarketer (Tr. 173).  He alleges disability due to "claw feet," partial paralysis, diabetes, neuropathy, neck problems, Post Traumatic Stress Disorder ("PTSD"), mood swings, and "injured knees and ankles" (Tr. 172).

---

[1]

While Plaintiff also applied for child's insurance benefits because the alleged onset of disability (at age 19) occurred before his 22nd birthday, the analysis used in adult claims applies.  *Castle v. Comm'r of Soc. Sec.,* 2016 WL 1069006, *2 (E.D. Mich. Mar. 18, 2016)(Edmunds, J.)(relying on 20 C.F.R. § 404.350(a)(5)("five-step sequential evaluation applies" where the alleged onset occurs at age 18 or older but before age 22).

### A.  Plaintiff's Testimony

Plaintiff offered the following testimony:

He completed around 14 months of college and was able to read and write without problems (Tr. 37-38).  He was single and had three children, ages 18, 12, and 1(Tr. 38-39).  He lived in a "bi-level" home in Jerome, Michigan (Tr. 39).  He received $2,887 in VA benefits each month (Tr. 40).  He received health benefits through the VA (Tr. 41).  He owned his car and drove approximately 60 to 70 miles each week (Tr. 41).  He previously served both state and federal jail and prison time and had more recently spent about one month in jail for "yell[ing] at a judge" (Tr. 42).

Plaintiff was discharged from the Marine Corps due to a foot problem predating his military service (Tr. 42).  He had been diagnosed with dropped arches and he was unable to run 10 miles a day and walk for 60 as required by the Marines (Tr. 43-44).  The condition was characterized by calluses and foot numbness and tingling (Tr. 44).  His superiors determined that discharge rather than surgery was appropriate (Tr. 45-46).   After being discharged, he turned to crime after experiencing problems finding a job (Tr. 46).

Plaintiff later discovered that he had been originally misdiagnosed and that according to VA treaters, he actually experienced "claw foot"  (Tr. 47).  Due to the foot condition and "bad knees," he used a cane to prevent falls (Tr. 49).  He had not undergone surgery but had foot calluses "pared" regularly (Tr. 51).  The foot condition was aggravated by diabetes (diagnosed in 2000) and neuropathy (Tr. 52).  He did not receive "the best treatment" for the

-3-

condition during his eight years in a federal prison (Tr. 53).  He worked as an orderly during the prison stint and was restricted to a bottom bunk (Tr. 56).

Plaintiff also experienced neck pain resulting from a car accident and had hyperlipidemia (Tr. 57).  He took Flexeril as well as Latapin for the neuropathy and Percocet and Tramadol for pain (Tr. 58).  He took Klonopin to control his anger (Tr. 58).  He spent most of the day stretching (Tr. 59). He was able to cook microwave meals, take out the trash, handle a broom for five minutes, and hang up a towel but relied on girlfriends and family to perform laundry and yard chores (Tr. 59-60).  He could bathe and otherwise take care of his 21-month-old son (Tr. 61, 64).  He spent most of his waking hours "lay[ing] around" and making medical appointments for VA treatment (Tr. 61).  He was able to use a computer and did not experience cognitive problems (Tr. 63).  He did not attend parties due to financial constraints (Tr. 65).  He was unable to jog due to foot calluses (Tr. 67-68).  He used shoe insoles and ankle braces (Tr. 71).  He used a TENS unit (Tr. 71-72).  The VA installed handicap rails in his home bathroom and an outdoor ramp (Tr. 72).

Plaintiff's knee and foot conditions had worsened in the past 20 years (Tr. 73-75). He had been told by treating sources that he would eventually be confined to a wheelchair (Tr. 75-76).  He had recently discontinued steroid injections because they exacerbated rather than helped his condition (Tr. 76).  He received physical therapy twice a week (Tr. 77).  He customarily drove himself to appointments unless he had taken pain medication (Tr. 77).

### B.    Medical Evidence[2]

### 1. Treating Sources

### a. Records Created During the Relevant Period

A September, 1991 x-ray of the lower legs, taken in response to Plaintiff's report of knee, shin, ankle, and foot pain, showed no acute abnormality (Tr. 948, 958-959). Treating records note that he had been using shoe inserts for the past year (Tr. 952). In October, 1992, Plaintiff reported continued foot pain and two episodes of locked knees (Tr. 946).

In January, 1996, Plaintiff sought emergency treatment for abdominal pain (Tr. 258). He was diagnosed with "probable gastroenteritis" (Tr. 259). In March, 1996, Plaintiff reported left knee pain while running and knee locking while engaged in "active sports" (Tr. 971). Plaintiff showed no muscle atrophy but demonstrated a shuffling gait (Tr. 971). Imaging studies of the bilateral knees were unremarkable (Tr. 973). In May, 1997, Plaintiff was prescribed Motrin 800 for a left hand injury (Tr. 255). He was given a two-day work release (Tr. 255). X-rays of the wrist were unremarkable (Tr. 251). Plaintiff reported that he experienced "persistent" left wrist pain while playing 18 holes of golf (Tr. 250).

### b. Records Post-Dating the Expiration of Benefits

In June, 2008, Plaintiff received emergency treatment for hyperglycemia (Tr. 235-236). September, 2008 imaging studies showed a mild "hammertoe type deformity" and

---

[2]For an award of benefits, Plaintiff must show that he was disabled prior to the June 30, 1998 expiration of benefits (Tr. 21). Medical records significantly post-dating the expiration are included for background purposes only.

"mild" spurring at the right Achilles tendon insertion (Tr. 644). The following month, Plaintiff was diagnosed with depression with a GAF of 55[3] (Tr. 646-650). August, 2009 records note that Plaintiff's knees locked and gave way, consistent with arthritis of both knees resulting from bilateral cavus foot and Achilles tendinitis (Tr. 645).

April, 2010 imaging studies of the lumbar and thoracic spine showed mild degenerative disc disease and moderate to severe stenosis at C3-C4 and C5-C6 (Tr. 601-603, 730-732). Plaintiff alleged loss of bowel control following a March, 2010 car accident (Tr. 519). The following month, an MRI of the lumbar spine showed a mild disc bulge at L5-S1 (Tr. 599). An MRI of the cervical spine showed moderate to severe stenosis at C5-C6 and C6-C7 (Tr. 596). Plaintiff reported that his back condition worsened as a result of the March, 2010 accident (Tr. 766). June, 2010 imaging studies of the pelvis were unremarkable (Tr. 588, 735). The same month, Plaintiff was encouraged to perform daily care for the foot callus condition with a pumice stone and moisturizer (Tr. 467). Nerve conduction studies of the upper extremities showed mild peripheral neuropathy consistent with diabetes (Tr. 442, 445, 578).

In July, 2010, neurosurgeon William R. Stetler, M.D. found that Plaintiff was not a candidate for back surgery (Tr. 437-438, 572-573). Dr. Stetler noted that the professed pain

---

[3]

A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. *American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders--Text Revision*, 34 ("*DSM-IV-TR*") (4th ed. 2000).

was "out of proportion" to the exam (Tr. 573). Dr. Stetler opined that the imaging studies showed "chronic age related" conditions rather than signs of injury from the recent motor vehicle accident (Tr. 573). Dr. Stetler noted that Plaintiff was "hyper-focused on qualifications for disability," a lawsuit related to the car accident, and pain medication dosages (Tr. 571). Plaintiff demonstrated full grip strength (Tr. 571). An examination of the feet showed no other abnormalities (Tr. 423). In October, 2010, Plaintiff reported that he had experienced lower back pain for "several years" (Tr. 407). November, 2010 physical therapy records note a normal gait despite Plaintiff's report of up to level "10" back and neck pain (Tr. 399, 562). The following month, Plaintiff received a epidural steroid injection (Tr. 429). The same month, treating staff noted that the foot calluses required paring (Tr. 423). Plaintiff was again urged to care for his feet everyday (Tr. 423). The following month, he requested a cane (Tr. 389).

February, 2011 psychological therapy notes state that Plaintiff was currently prescribed psychotropic medication (Tr. 368). April, 2011 treating records state that Plaintiff had experienced diabetes mellitus since 2000 and had been taking insulin since November, 2008 (Tr. 349). May, 2011 therapy notes state that Plaintiff expressed an interest in continuing psychological treatment (Tr. 336). In July, 2011, Plaintiff was jailed for talking back to a judge during a child custody hearing (Tr. 283, 317). In October, 2011, Plaintiff was again encouraged to take care of feet on a daily basis (Tr. 704).

March, 2012 correspondence from the VA states that Plaintiff was deemed "totally and permanently disabled" due to service-connected disabilities (Tr. 606). Conditions contributing to the disability included diabetes mellitus ("without mention of complication"), lower extremity joint problems, bursitis, lumbago, hyperlipidemia, and depression (Tr. 609-610). Treating records from the same month state that Plaintiff was "active" due to "lawncare and childcare" (Tr. 663). In July, 2012, Plaintiff was referred for occupational therapy (Tr. 743). The following month, Plaintiff was advised to make dietary changes to address diabetes (Tr. 942-943). Plaintiff reported that he had increased his walking in an attempt to lose weight (Tr. 939). Treating records note the symptoms of peripheral sensory neuropathy (Tr. 804, 847). Plaintiff reported that he was not "able to do much activity" with his physical problems, noting that it took him four hours to mow the lawn (Tr. 823, 838). November, 2012 physical therapy records note "impaired lumbar mobility" with "leg length discrepancy" impeding normal lumbar movement (Tr. 794, 870). The same month, Plaintiff admitted that he was not monitoring his blood sugar levels due to life stressors (Tr. 795). A February, 2013 MRI of the lumbar spine showed degenerative changes at L5-S1 with minimal disc bulge effacement (Tr. 755-756).

### 2. Consultative and Non-Examining Sources

A November, 2011 consultative psychological examination noted a diagnosis of depression, anxiety, and bipolar disorder (Tr. 281-282, 540-541). Plaintiff denied limitations in activities of daily living, noting that he used his computer and raised pit-bulls as a hobby

(Tr. 541, 687). In June, 2012, Jerry Csokasy, Ph.D. found insufficient evidence to evaluate Plaintiff's allegations of psychological limitation prior to the June 30, 1998 expiration of benefits (Tr. 98). He assigned a GAF of 66[4]

### C.   Vocational Expert Testimony

VE Toni McFarlane found that none of Plaintiff's former jobs constituted past relevant work (Tr. 78). The ALJ then posed the following set of limitations to the VE, describing a hypothetical individual of Plaintiff's age, education, and work background:

> [S]edentary work[5] . . . . Limited to occasional posture maneuvers such as balancing, stooping, kneeling, crouching, crawling and climbing ramps and stairs; must avoid climbing ladders, ropes and scaffolds; limited to occasional pushing and pulling with the lower left and right extremities to include the operation of foot pedals; also limited to occupations which do not require exposure to dangerous machinery and unprotected height; limited to simple, routine, repetitive tasks not performed in a fast-paced production environment; involving only simple, work-related decisions and, in general, relatively few workplace changes; and limited to occasional interaction with the general public (Tr. 78-79).

---

[4] GAF scores in the range of 61-70 indicate "some mild [psychological] symptoms or some difficulty in social, occupational, or school functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34 (*DSM-IV-TR* ) (4th ed.2000).

[5]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

The VE responded that the hypothetical individual could perform the unskilled, sedentary work of a document preparer (2,100 positions in the regional economy); final assembler (1,500); and lens inserter (1,300) (Tr. 79-80). The VE testified further that if the modifiers of "simple, routine, repetitive tasks not performed in a fast-paced production environment;" "only simple, work-related decisions;" "relatively few workplace changes;" and "occasional interaction with the general public" were removed, the same individual could perform the sedentary work of telephone quotation clerk (1,600); table worker (500); and parimutuel ticket checker (1,200) (Tr. 79-81). The VE found that if the individual were also limited by the need to miss at least four days of work each month, all work would be precluded (Tr. 82). The VE stated that her testimony did not conflict with the information found in the *Dictionary of Occupation Titles* ("*DOT*") (Tr. 82).

 In response to questioning by Plaintiff's attorney, the VE testified that the majority of sedentary jobs contained a sit/stand option, but noted that the ALJ did not include the restriction in the hypothetical limitations (Tr. 49). She testified that the need to take naps over the course of the workday would preclude all employment (Tr. 49-50).

### D.  The ALJ's Decision

Citing the medical records, ALJ Gartner found that prior to the age of 22 and through the date last insured ("DLI") of June 30, 1998, Plaintiff experienced the severe impairments of "bilateral cavus foot and bilateral osteoarthritis of the knees" but that neither condition met or medically equaled impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr.

22).  Through the DLI, the ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") for sedentary work with the following additional limitations:

> [O]ccasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs; no climbing of ladders, ropes, and scaffolds; occasional pushing and pulling with the bilateral lower extremities to include the operation of foot pedals; and no exposure to dangerous machinery and unprotected heights (Tr. 22).

Citing the VE's findings, the ALJ found that Plaintiff could work as a telephone quotation clerk, table worker, and parimutuel ticket checker (Tr. 27, 81).

The ALJ discounted the alleged degree of limitation for the relevant period.  He noted that records from the relevant period show full motor strength and no atrophy of the lower extremities (Tr. 24).  The ALJ observed that as of May1, 1997, Plaintiff's alleged limitations did not prevent him from playing golf and that he did not require the use of an assistive device until 2011 (Tr. 24).  The ALJ noted that Plaintiff did not receive "any form of mental health treatment" until September, 2009 (Tr. 25).  The ALJ observed that while 2010 MRI studies of the lumbar spine showed the presence of degenerative disc disease, they were not relevant to Plaintiff's condition before the June 30, 1998 expiration of benefits (Tr. 25).  Likewise, the ALJ found that while various treating sources provided "numerous opinions" of Plaintiff's limitations, they were generated "well after the period at issue," noting that there was "no indication" that the opinions "were meant to encompass [Plaintiff's] functional capacity during the time period at issue" (Tr. 26).

-11-

### III.  STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

### IV.  FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

-12-

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V.  ANALYSIS

### A.  Evaluation of the Medical Evidence

Plaintiff argues that the ALJ erred by failing to accord controlling weight to the treating physicians' findings.  *Plaintiff's Brief,* 9-13, *Docket #15.*  He contends that the records "are replete with complaints and diagnos[e]s regarding his medical condition(s) dating back as far as 1990."  *Id.* at 12.

Plaintiff is correct that the opinion of a treating physician is entitled to deference.  "[I]f the opinion of the claimant's treating physician is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

-13-

substantial evidence in [the] case record, it must be given controlling weight." *Hensley v. Astrue,* 573 F. 3d 263, 266 (6th Cir. 2009)(internal quotation marks omitted)(*citing Wilson,* 378 F.3d 541, 544 (6th Cir. 2004)).   An ALJ is required to provide "good reasons" for declining to accord controlling weight to a treating opinion. *Wilson* at 544; 20 C.F.R. 1427(c)(2).

However, Plaintiff's argument is inapplicable to the present set of facts.  The scant medical records predating the June 30, 1998 expiration of benefits do not contain a treating "opinion."   "'Medical opinions are statements from physicians ... that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.'" *Winter v. Comm'r of Soc. Sec.,* No. 12-11962, 2013 WL 4604782, *3 (E.D. Mich. Aug. 29, 2013)(*citing* 20 C.F.R. § 404.1527(a)(2))(treating records, with nothing more, are not entitled to the deference according a treating "opinion").  Moreover, records created during the relevant period (showing that despite knee and foot complaints, Plaintiff was able to engage in running, golf, and "active sports") are generously addressed by the RFC for a limited range of sedentary work (Tr. 22, 250, 255, 971).

Plaintiff urges the Court to also consider the evidence created after the relevant period.   Generally, "evidence of disability obtained after the expiration of insured status is generally of little probative value," *Strong v. Comm'r of Soc. Sec.*, 88 Fed.Appx. 841, 845 (6th Cir. 2004).   However, "a treating physician's opinion rendered after the DLI 'may be

considered to the extent it illuminates Plaintiff's health before the expiration of her insured status.'" *Stark v. Comm'r of Soc. Sec.,* 2016 WL 1077100, *6 (N.D. Ohio Mar. 18, 2016)(*citing Nagle v. Comm'r of Soc. Sec.,* 191 F.3d 452, 1999 WL 777355, *1 (6th Cir. September 21, 1999))(unpublished)(punctuation omitted); *Higgs v. Bowen,* 880 F.2d 860, 863 (6th Cir.1988).

However, the VA treating records from 2008 forward do not support the child disability benefits or DIB. The Court has carefully reviewed the records created from 2008 forward for possible relevance to Plaintiff's condition before the June, 1998 expiration of benefits. While the newer records show that Plaintiff's condition deteriorated after the expiration of benefits, they do not support a disability finding before June 30, 1998. As the ALJ noted, the newer records containing assessments or opinions of Plaintiff's limitations post-date the expiration of benefits by at least 10 years (Tr. 26). Further, a portion of the newer records undermines rather than supports a finding that the disability began on or before June 30, 1998. While Plaintiff reported in October, 2010 that he had experienced back pain for "several years" (Tr. 407), he reported that a March, 2010 car accident worsened his back pain (Tr. 766), suggesting that he did not experience disability-level limitations until after the car accident. April, 2011 treating records state that Plaintiff experienced diabetes mellitus since only 2000 (Tr. 349). Moreover, the records indicate that the condition remained asymptomatic until 2008 or later (Tr. 349). As the ALJ noted, the record does not show that Plaintiff received any mental health treatment before re-establishing care with the

-15-

VA in 2008 (Tr. 24-25).

Plaintiff's argument that the ALJ ought to have given increased consideration to the VA's disability finding is likewise defeated by the dearth of evidence predating the expiration of benefits.  To be sure, SSR 06-3p states that  "evidence of a disability decision by another governmental . . . agency cannot be ignored and must be considered," notwithstanding that "the final responsibility" for determining disability is reserved to the Commissioner of Social Security.  2006 WL 2329939, *6 (August 9, 2006).  As required by the Ruling, the ALJ acknowledged the disability findings by the VA (Tr. 23-24).  The ALJ noted that while the VA records substantiated Plaintiff's *current* alleged limitations, "all of the[] records are dated significantly after the dates required to establish disability" and failed to "reflect that the[] impairments existed during the relevant periods necessary" (Tr. 25).  The ALJ noted that the VA finding of cervical spine osteoarthritis post-dated the March, 2010 accident (Tr. 25).  He observed that while the VA records showed neuropathy and calluses resulting from diabetes, none of the evidence suggested that Plaintiff experienced those symptoms during the relevant period (Tr. 25).   As to the psychological limitations, the ALJ noted that Plaintiff did not receive mental health treatment until September, 2009 (Tr. 25).  The ALJ reiterated that he gave "little weight" to the VA records from 2008 forward because they referred to Plaintiff's condition "well after the date last insured" and that "there is no indication that those proffering opinions had a relationship with [Plaintiff] during the time period at issue . . . or that the opinions were meant to encompass [his] functional capacity

during the time period at issue" (Tr. 26). Because the ALJ's rejection of the VA's disability ruling is well articulated and supported, a remand is not warranted.

### B. The Credibility Determination

 Plaintiff argues, in effect, that the ALJ's credibility determination was not well supported. *Plaintiff's Brief* at 13-17. He contends that the "medical records are replete with complaints" regarding the conditions of cavus foot and osteoarthritis of the knees. *Id.* at 15. He also argues that the ALJ failed to articulate his reasons for rejecting the alleged limitations. *Id.* at 16.

The ALJ's credibility determination does not contain substantive or procedural error. As required by SSR 96-7p,[6] the ALJ first determined that Plaintiff experienced the medically determinable impairments of bilateral cavus foot and bilateral osteoarthritis of the knees (Tr. 22); 1996 WL 374186, *2 (July 2, 1996). As discussed above, substantial evidence supports the finding that Plaintiff did not experience additional severe impairments on or before June 30, 1998.

 As required by the second prong of SSR 96-7p, the ALJ also considered "the entire

---

[6]

In March, 2016, SSR 16-3p superceded SSR 96-7p. The newer Ruling eliminates the use of the term "credibility" from SSA policy. SSR 16-3p, 2016 WL 1119029, *1 (Mar. 16, 2016). The Ruling states that "subjective symptom evaluation is not an examination of an individual's character." Instead, ALJs are directed to "more closely follow [the] regulatory language regarding symptom evaluation." *See* 20 C.F.R. § 404.1529(c)(3), fn 7, below.

Nonetheless, SSR 96-7p applies to the present determination, decided on October 2, 2013. *See Combs v. Comm'r of Soc. Sec.,* 459 F.3d 640, 642 (6th Cir. 2006)(*accord* 42 U.S.C. § 405(a))(The Social Security Act "does not generally give the SSA the power to promulgate retroactive regulations").

case record" in rejecting Plaintiff's allegations for the relevant period. *Id.*[7] The ALJ noted that the claims of disability occurring on or before June 30, 1998 were not supported by either the treating records or Plaintiff's contemporaneous descriptions of his activities. The ALJ cited September, 1991 records showing full motor strength and no foot lesions (Tr. 24). He noted that a 1996 x-ray of the bilateral knees was unremarkable (Tr. 24). Plaintiff reported to his treating source that he engaged in "active sports" and "carpet cleaning" (Tr. 24). The ALJ noted that as of May1, 1997, Plaintiff was able to play 18 holes of golf (Tr. 24). Again, the ALJ noted that while the records from 2008 forward supported additional limitations, the records predating the expiration of benefits did not support a disability finding (Tr. 24-25).

While Plaintiff contends that the ALJ did not adequately address the conditions of cavus foot and osteoarthritis of the knees, the ALJ noted that Plaintiff did not require a walking aide until 2011 - almost 13 years following the expiration of benefits. Despite the

---

[7]In addition to an analysis of the medical evidence, 20 C.F.R. § 404.1529(c)(3) lists the factors to be considered in making a credibility determination:

> (i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms ... and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms."

lack of documentation for the claim of disability on or before June 30, 2016, the ALJ partially credited Plaintiff's claims by limiting him to sedentary work and only "occasional" pushing and pulling in the lower extremities (Tr. 22). Because the ALJ's credibility determination is well articulated and both procedurally and substantively sound, it should remain undisturbed. *See Casey v. Secretary of Health and Human Services*, 987 F.2d 1230, 1234 (6th Cir.1993); *Anderson v. Bowen*, 868 F.2d 921, 927 (7th Cir.1989)(*citing Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir.1986))(An ALJ's "credibility determination must stand unless 'patently wrong in view of the cold record'").

My recommendation to uphold the ALJ's decision should not be read to trivialize Plaintiff's current health problems. Nonetheless, the determination that he was capable of a range of unskilled, sedentary work before the age of 22 and prior to the June 30, 1998 expiration of benefits is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level and should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## VI. CONCLUSION

For the reasons stated above, I recommend that Plaintiff's Motion for Summary Judgment [Dock. #15] be DENIED, and that Defendant's Motion for Summary Judgment [Dock. #16] be GRANTED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR

72.1(d)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir.  1991); *United States v. Walters*, 638 F.2d 947 (6th Cir.  1981).   Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.  1991); and *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.  1987).   Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc.; any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity.   The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.

s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: July 26, 2016

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was sent to parties of record on July 26, 2016, electronically and/or by U.S. mail.

<div style="margin-left: 40%;">

<u>s/Carolyn M. Ciesla</u>
Case Manager to the
Honorable R. Steven Whalen

</div>